In the Matter of the Petition of the NEW YORK CABLE COMPANY, Appellant, v. THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, et al., Respondents.

The act of 1875, known as the "Rapid Transit Act" (Chap. 606, Laws of 1875), prior to the passage of the "General Surface Act" (Chap. 252, Laws of 1884), authorized the formation of companies to construct street railways on the surface, to be operated by any power other than animal. (EARL, J., dissenting.)

The "General Surface Act" was not intended to, and does not interfere with the rights of any street surface railroad company organized before its passage under the "Rapid Transit Act;" it only prohibits the construction of surface roads by corporations thereafter organized. The saving clause in the "General Surface Act" protects, not only consummated and perfected rights of a company theretofore organized, but such rights as the company had, although inchoate and subject to the performance of further conditions; and by the subsequent perform ance of the conditions those rights are perfected. (EARL, J., dissenting.)

As, however, the "Rapid Transit Act" prescribes the proceedings by which rights may be acquired, a substantial compliance with the material requirements of the act is a condition precedent, without performance of which a company never became legally incorporated or acquired any rights under the act.

The intent of the provision of the "Rapid Transit Act" (§ 6), requiring the commissioners appointed by the mayor of a city to fix and determine

---

* This volume also contains two cases, the first one, and *Wright* v. *Chapin*, *post* page 369, which were not reported when reached in their order, as motions were then pending for reargument.

the time within which the proposed railway or railways, or portions thereof shall be constructed, is to limit the corporation in respect only to time during which it is possible for it to prosecute the work, excluding time when legal barriers exist to such prosecution.

Where, therefore, the commissioners appointed by the mayor of New York specified a time within which each of twenty-nine different routes located by them should be completed, but provided that the time should begin to run from the date of the obtaining the requisite consent of property owners and of the local authorities, or, in case of failure to procure such consent, from the date of the confirmation of the report of commissioners appointed by the court; and also provided that the time unavoidably consumed by the pendency of legal proceedings or the interference of public authorities, or the omission to open or grade shall not be deemed a part of the time limited. *Held,* that this was a substantial compliance with the act.

The articles of association, framed by the mayor's commissioners, instead of providing, as required by said act (§ 7), for the release and forfeiture to the supervisors of the county of all the rights and franchises acquired by the corporation, in case the proposed railways were not completed in time, provided, that in case the several portions of such railways were not completed each within the time limited, the rights and franchises " for and as to any portion of such railway or railways not so completed," shall be released and forfeited. *Held,* that this was a material departure from the requirements of the act; that the provision should have been for the release and forfeiture of all the rights and privileges; that the provision was an attempt to override the action of the Legislature in refusing to make the amendment to the " Rapid Transit Act " of 1882 (§ 2, Chap. 393, Laws of 1882), applicable to the city of New York, by incorporating the substance of the amendment in the articles of association.

Also, *held,* that as there was no general law, declaring a forfeiture or requiring a release to the supervisors, a compliance with the provision was necessary to carry out the legislative intent, and the failure to comply was a fatal defect in the articles.

Also, *held,* that while by the act of 1870 (Chap. 190, Laws of 1870) the board of supervisors of the county of New York, composed of supervisors, as before elected or appointed, was declared abolished, a new board of supervisors was created (Chap. 137, Laws of 1870) and is in existence to which the franchises of the company may be forfeited and released.

Under the provision of the Rapid Transit Act (§ 5), requiring the mayor's commissioners to fix the plan or plans for the construction of the railway or railways, it is, at least, essential that they shall determine whether the contemplated road shall be an underground, overground or surface road. and a failure on their part to determine this ques-

tion is a failure to comply with one of the conditions precedent to the acquisition of corporate power.

By the resolutions of the commissioners, incorporated in the articles of association, as to several of the routes laid out, it was left to the subsequent election of the company whether they should be surface or elevated roads   As to other routes, where the articles provided for elevated roads, with a double track, authority was given to the company to add such other tracks as might, from time to time, be needed to accommodate increasing traffic and to make such additions to the structures as might be needed.   It was, also, left to the company to determine as to the method of supporting the tracks, *i. e.*, whether they should be carried on longitudinal girders resting on the top of columns or by transverse girders supported by columns.  .The power to erect stations and platforms was not restricted or defined, but it was left to the company to decide where they were necessary, it was authorized to occupy so much of the sidewalks for stairways and approaches "˙ as may be necessary," and also to construct " such supports, turn-outs * * * stations, buildings, platforms, stairways * * * and such other requisite appliances as shall be proper." *Held*, that the commissioners failed to substantially comply with the act, and that as such compliance was essential there was no valid organization of the petitioner.

A motion for reargument was made upon papers showing proceedings instituted to amend in the particulars in which the court had held the articles to be defective.  *Held*, that, conceding such proceedings were effectual, they would not afford ground for a reargument, as the jurisdiction of this court is confined to a review of the determinations actually made by the Supreme Court, and must be had upon the same papers which were before the General Term.

*It seems* that the order of this court affirming the order of General Term, denying the application of the petitioner will be no obstacle to a rehearing by the General Term, or to a new application, based upon new facts.

Where it is sought to take the property of an individual under powers granted by statute to a corporation, to be formed in a particular manner therein directed, the constitutional protection of the rights of private property requires that the powers granted be strictly pursued, and all the prescribed conditions performed.

*It seems* where the power is conferred upon a corporation duly formed, it will not be defeated simply because the corporation has done or omitted some act which may be a cause of forfeiture of its rights and franchises, as it rests with the State to determine whether such forfeiture will be enforced.

*In re G E. R. Co.* (70 N. Y. 361) ; *In re N. Y. E. R. R. Co.* (70 id. 327); *In re B. W. & N. R. Co.* (72 id. 245) distinguished.

(Argued October 21, 1886; decided December 17, 1886.)

APPEAL from order of the General Term of the Supreme Court in the first judicial department, made December 1, 1884, denying a motion on the part of the petitioner, the New York Cable Railway Company, to confirm the report of commissioners appointed by the Supreme Court to determine whether the railways described in the petition of said company ought to be constructed and operated.

The report of the commissioners was in favor of the petitioner. The refusal to confirm their report was upon the ground that the petitioner had no legal right to construct or operate a railway.

The facts, so far as material, are stated in the opinion.

*Wm. M. Evarts, Robert Sewell, Everett P. Wheeler, Chas. P. Shaw* for appellant. The decision is this case having been put solely on legal grounds is appealable to this court. (*Allen* v. *Myer*, 73 N. Y. 1; *Tolman* v. *S. B. & N. Y. R. R. Co.* 92 id. 356; *Russell* v. *Conn.* 20 id. 83.) The motion to confirm the report of the commissioners should be granted. (*Morris* v. *Talcott*, 96 N. Y. 100; *Marvin* v. *Marvin*, 78 id. 541; *Fredericks* v. *Taylor*, 52 id. 526; *Sturgis* v. *Spofford*, 58 id. 103; *Fulton Fire Ins. Co.*, v. *Baldwin*, 37 id. 652.) Section 16 of the act of 1884 (Chap. 252) cannot be so construed as to take away vested rights, and would be void if it attempted to do so. (*Westervelt* v. *Gregg*, 12 N. Y. 209; *State Constitution, art.* 1, § 6; *Stuart* v. *Palmer*, 74 id. 183.) The Legislature cannot pass a law impairing the obligation of a contract. (*U. S. Con. art.* 1, § 10; *In re Bank of Buffalo*, 21 N. Y. 14, 15; *In re Reciprocity Bank*, 17 How. Pr., 327; *Farrington* v. *Sec. of Tennessee*, 95 U. S. 679; *Dodge* v. *Woolsey*, 16 How. [U. S.] 367; *State Bank of Ohio* v. *Knoop*, 18 id. 331.) A contract between the State and a citizen cannot be modified or changed by any act of the legislature. (*Donald* v. *State*, 89 N. Y. 36; *People* v. *Otis*, 90 id. 48.) Statutes are never to have a retrospective or retroactive operation unless it is so clearly expressed in the act, and

not then if it would take away vested *rights* (as distinguished from remedies). (*Goillotel* v. *Mayor, etc.,* 87 N. Y. 441; *People* v. *Lord,* 12 Hun, 282; *Johnson* v. *Burrell,* 2 Hill, 238; *Butler* v. *Palmer,* 1 id. 325–334; *Dash* v. *Van Kleeck,* 7 John. 477; *McMannis* v. *Butler,* 49 Barb. 176; *Waddell* ·v. *Elmendorf,* 12 id. 585; *Burley* v. *Pampacher,* 5 Duer, 188; *Ganson* v. *City of Buffalo,* 1 Keyes, 460–461; *Potter's Dwarris on Statutes,* 162, *n.* 9; 1 *Kent's Com.,* 455; *Jarvis* v. *Jarvis,* 3 Edw. Ch. 462; *Van Rensselaer* v. *Livingston,* 12 Wend. 420–491.) The right of the company to complete its proceedings is a vested right. (*In re Thirty-fourth St. R. Co.,* 5 East. R. 697; *Westervelt* v. *Gregg,* 12 N. Y. 202; *Hurd* v. *Cass,* 9 Barb. 866; *Holmes* v. *Holmes,* 4 id. 295; *Snyder* v. *Snyder,* 3 id. 621; *Benson* v. *Mayor, etc.,* 10 id. 223–234; 2 *Kent's Com.,* 275.) When the right to alter, amend or withdraw franchises is provided for in the charter itself, it may be done, as that is a part of the contract, but not otherwise. (*McLaren* v. *Pennington,* 1 Paige, 102.) The act of 1875, under which the Cable Company is incorporated, contains no such provision. (*McLaren* v. *Pennington,* 1 Paige, 102; *Benson* v. *Mayor, etc.,* 10 Barb. 223; *Dartmouth College* v. *Woodward,* 4 Wheaton, 518; *State Bank of Ohio* v. *Koop,* 16 How. [U. S.] 369; *Dodge* v. *Woolsey,* 18 id. 331; *N. O. Gas Co.* v. *Louisiana Light Co.,* 115 U. S. 650.) If there be a *bona fide* endeavor to comply with the requirements of the general acts for the creation of corporations and a certificate be filed, which is in good faith an attempt to follow them, a corporation *de facto* is created, which has the right to sue and be sued, and whose existence cannot be challenged collaterally, but only in a proceeding by the attorney-general. (*Eaton* v. *Aspinwall,* 19 N. Y. 119, 121; *Buffalo & Alleghany R. R. Co.* v. *Cary,* 26 id. 75–77; *In re N. Y. El. R. R. Co.,* 70 id. 338; *Methodist Church* v. *Pickett,* 19 id. 482; *Bank of Toledo* v. *International Bank,* 29 id. 542; *Holmes* v. *Gilliland,* 41 Barb. 588; *Mechanic's Building Association* v. *Stevens,* 5 Duer. 676;

*In re Brooklyn, etc., R. R. Co.,* 75 N. Y. 335.) Even if the railroad crosses prohibited streets the part not prohibited is valid. (*Gilbert El. R. Co.,* 70 N. Y. 361, 373 ; Laws of 1881, chap. 485 § 2.) Even if there was a defect in the organization of the corporation, it could only be taken advantage of by the State, by a direct proceeding for that purpose by the attorney-general, which the State could waive, either expressly or by omitting to proceed, or by subsequent legislative recognition. (*In re N. Y. El. R. R. Co.,* 70 N. Y. 338 ; *White* v. *Ross,* 15 Abb. 66 ; *Black River & Utica R. R. Co.* v. *Barnard,* 31 Barb. 258.) A provision in a public statute like this, prescribing a time within which an act should be done, containing no negative words forbidding the doing of the act afterwards, is directory, and a literal compliance with its terms in regard to time is not essential to the validity of the act. (Sedgwick on Stat. and Const. Law. 370, 371, 376 ; *People* v. *Sup'rs. of Ulster,* 34 N. Y. 272 ; *Barnes* v. *Badger,* 41 Barb. 99.) When any act or thing is ordered to be done or agreed to be done, and no time is specified, it must be done in a *reasonable* time. (*Fickett* v. *Brice,* 23 How. 194 ; Story on Con. § 790 ; 2 Pars. on Con. 47, 173.) All the circumstances being known what is a reasonable time is a question of law. (Story on Con. § 790 ; 2 Pars. on Con. 173.) The order of the General Term is appealable under chapter 270 of the Laws of 1854. (*In re Brady,* 69 N. Y. 219 ; *Allen* v. *Myer,* 73 id. 1 ; *Tolman* v. *S. B. & N. Y. R. R. Co.,* 92 id. 356 ; *Russell* v. *Conn.* 20 id. 83 ; *In re Kings Co. El. R. Co.,* 82 id. 95 ; *N. Y. El. R. Co.,* 70 id. 327, 333 ; *Thirty-fourth St. R. Co.,* 5 East. R. 697.)

*William C. Trull* and *Luke F. Cozans* for the Chambers Elevated, etc., Railroad Company and others, respondents. Statutory provisions as to time are to be deemed directory unless of the essence of the thing to be done. (*Wood* v. *Chapin,* 3 Kern. 509 ; *In re Emp. City Bk.* 18 N. Y. 200 ; *People* v. *Cook,* 4 Seld. 69 ; *Bowers* v. *Badger,* 41 Barb. 98,

99; *In re N. Y. El. R. R. Co.*, 7 Hun, 241.) The proviso of section 4 of the act of 1875, makes the consent of the property owners and local authorities, or the determination of the commissioners confirmed by the court in lieu of consent of the property owners, a condition precedent to the exercise of the power previously of locating routes. (*Voorhes Bk. of U. S.* 10 Pet. 449; *Weyman* v. *Southard*, 10 Wheat. 150; *In Re Second Avenue M. E. Church*, 66 N. Y. 395; *In re Webb*, 24 How. 247; *In re N. Y. El. R. R. Co.*, 70 N. Y. 359.) The mayor's commission had no power to locate a route upon the surface of the streets. (*In re N. Y. El. R. R. Co.*, 70 N. Y. 343; *In re Gil. El. R. R. Co.*, id. 361.) The action of the mayor's commission in resolving, as it did, that "on streets chiefly used for residences, or bordering on parks or public squares, or on a river front, stations may be placed over the sidewalks of the streets," was a clear neglect of duty and assumption of power. (*Mattlage* v. *N. Y. E. & M. R. R. Co.*, 67 How. Pr. 232; *In re Boston, etc.*, 10 Abb. [N. C.] 104; *N. Y., etc.*, v. *Godwin*, 12 Abb. [N. S.] 21; *N. Y., etc.*, v. *New York*, 11 Abb. [N. C.] 383; *N. Y. C.* v. *Cottle*, 90 N. Y. 342, 347–349.) The provision of the sixth section of the act requiring the commissioners to "fix and determine a time" within which the road should be constructed and ready for operation, demand that a fixed, stated and definite time should be named. (*Donohue* v. *O'Connor*, 45 Sup. Ct. R. 299; *N. Y. Cable R. Co.* v. *Forty-second St. R. R. Co.* Ms. op.) The failure of the mayor's commission to comply with all the requirements of the statute in these particulars, renders the organization of the petitioner as a corporation defective and invalid. (1 Wood Rail. Law, 13, § 8; *In re N. W. & M. R. Co.*, 72 N. Y. 245; *Steam Transit Co.* v. *City of Brooklyn*, 78 id. 524.) The provision of the act of 1884, expressly prohibiting the construction by the petitioner of any railway upon the surface of the streets, applies to every street surface railroad not then constructed which claims the right to construct, under the authority of a commission appointed under the act of 1875. (*Falconer* v. *B. N.*

*J. R. R. Co.*, 69 N. Y. 491; *People* v. *Trustees of Ft. Edward*, 70 id. 28.) The legislature has power thus to prohibit the construction of the petitioner's road. (1 R. S. 800; Const., art. 8, § 1; Laws of 1875, chap. 606, § 34.) If the act of 1875 authorizes the construction of railways of the character of those claimed by the petitioner, it is unconstitutional, because of its failure to provide adequate compensation for the private property required to be taken in the construction and operation of the petitioner's railways. (70 N. Y. 327, 354, 360; *Wilson* v. *N. Y. C. R. R. Co.*, 47 N. Y. 161; *Arnold* v. *H. R. R. R. Co.*, 55 id. 661; *Story* v. *El. R. R. Co*, 90 id. 146.) The "court commission" erred in receiving oral and unverified statements, in favor of the proposed railways. (*T. & B. R. R. Co.* v. *North. Turnp. Co.*, 16 Barb. 103.)

*D. J. Dean* for the Mayor, etc., respondent. The Rapid Transit Act (Chap. 606 of the Laws of 1875) does not provide for or permit the creation of a steam surface railway. (*In re N. Y. El. R. R. Co.*, 70 N. Y. R. 343, 352, *In re Gil. El. R. Co.*, id. 361, 366.) The construction and operation of the petitioner's road is prohibited by section 16 of chapter 252 of the Laws of 1884. (*In re Kings Co. El. R. R.* 20 Hun, 225; *Spring Val. W. Works* v. *Schottler*, 110 U. S. 347; *Tomlinson* v. *Branck*, 15 Wall. 460; *Beer Co.* v. *Mass.* 97 U. S. 25; *Beik* v. *Chicago R. R. Co.*, 94 id. 167, 176; *Fort Plain Bridge Co.* v. *Smith*, 30 N. Y. 62.) The proceedings set forth in the record are insufficient under the Rapid Transit act (Chap. 606 of the Laws of 1875) to entitle the petitioner to the confirmation of the report presented. (*In re Brooklyn, etc., R. R. Co.*, 72 N. Y. 245; *N. Y. & L. R R. Co.*, 35 Hun, 220; 99 *N. Y.* 12; *Jenkins* v. *Union Turnp. Co.*, 1 Cai., Cases 94; *Crocker* v. *Kane*, 21 Wend. 211; *Hawes* v. *Aug. Sax. Co*, 101 Mass. 983; *Atley* v *U. Tool Co.*, 11 Gray, 139; *In re Trustees*, 57 How. Pr. 500; 80 N. Y. 642; *In re Em. Ind. Sav'gs Bk.* 75 id. 388; *Dillon on Mun. Corp.*, § 96; *Birdsall* v. *Clarke*, 75 N. Y. 73; *Thompson* v. *Schermerhorn*, 6 id. 92; *N. Y. & B. R. R. Co.*, v *God-*

*win*, 12 Abb. [N. S.] 26.)    All the facts, showing inability to agree as to price of lands must be fully stated in the affidavits presented to the court, and the inability to agree must appear, otherwise the court has no jurisdiction to appoint appraisers. (*Dykman* v. *Mayor, etc.*, 1 Seld. 493 ; *In re B. H. & R. R. Co.*, 79 N. Y. 71 ; *In re Marsh*, 71 id. 319.)

*Aaron J. Vanderpoel* for respondents.    It was the duty of the commissioners to locate the stations, landing places, buildings, platforms, stairways, etc.    (*In re Kings Co. El. R. Co.*, 20 Hun, 234.)    It was also their duty to fix and determine the time within which the consents should be obtained. (*Donahue* v. *O'Connor*, 45 N. Y. Supr. Ct. 278, 299.)    The Act of 1875, chapter 606, was not intended to provide for surface roads.    (*In re N. Y. El. R. Co.*, 70 N. Y. 343 ; 3 Abb [N. C.] 414 ; Laws of 1884, chap. 252 ; 1 R. S. 600, § 8 ; *White* v. *Syr. & U. R. R. Co.*, 14 Hun, 559 ; *Suydam* v. *Moore*, 8 Barb. 358 ; *Miller* v. *The State*, 15 Wall. 478 ; *Hyatt* v. *McMahon*, 25 Barb. 457 ; *Kerr* v. *Dougherty*, 79 N. Y. 327.)    The legislature has authority to make grants of franchises or to confer powers, on the consent of parties who may in any wise be affected thereby.    (*Brewster* v. *City of Syracuse*, 19 N. Y. 116, 118 ; *Tanner* v. *Trustees of Albion*, 5 Hill, 121, 131.)    The fact that Guy R. Pelton was an applicant to the mayor to appoint a commission rendered him incompetent to act as a commissioner to determine whether the railways should be constructed, notwithstanding the refusal of the owners of property to consent thereto. (*In re Houston St.*, 7 Hill, 175 ; *Peninsular R. Co.* v. *Howard*, 20 Mich. 18 ; *Pond* v. *Town of Milford*, 35 Conn. 32 ; *Page* v. *Contoocook Valley R. R. Co.*, 21 N. H. 438 ; *In re Kings Co. El. R. R. Co.*, 82 N. Y. 99 ; *Corporation* v. *Manhattan Co.*, 1 Cai. R. 507, 508 ; *Anthony* v. *South Kingston*, 13 R. I. 129 ; *Ex parte Hinckley*, 8 Me. 146 ; *State* v. *Delasdernier*, 11 id. 473 ; *Wilson* v. *Mitchell*, 49 Wis. 284 ; *Brooks* v. *Hishen*, 40 id. 674 ; *In re Albany St.*, 6 Abb. Pr. 273 ; *Inhabitants* v. *Dilley*, 24 N. J. [4 Zab.] 209, 213 ;

*People ex rel. Cooke* v. *Com. of Highways*, 57 N. Y. 549, 551; *Taylor* v. *County Comrs. of Worcester*, 105 Mass. 225; *In re Mt. Morris Square*, 2 Hill, 14; *In re B., N. & P. R. R. Co.*, 32 Hun, 289; *Hall* v. *Thayer*, 105 Mass. 219, 221; *Queen* v. *Aberdare Canal Co.* 14 Ad. & Ell. [N. S.] 584, 586; *In re Canada Northern R. Co.*, 7 Fed. Rep. 653, 655; *Shelton* v. *Town of Duley*, 27 Conn. 414; *Powers* v. *Bears*, 12 Wis. 213, 223; *Hazard* v. *Middletown*, 12 R. I. 227; *Peninsular R. Co.* v. *Howard*, 20 Mich. 18; *Mich. Air Line R. Co.* v. *Barnes*, 40 id. 383; *Fox* v. *Hills*, 1 Conn. 294, 300, 308, 309; *In re Hancock*, 27 Hun, 78; *Hall* v. *Thayer*, 105 Mass. 219; *Taylor* v. *County Comrs.*, id. 225; *Stephens* v. *People*, 18 L. J. 277; *People* v. *Mullin*, 3 Abb. L. J. 150; *In re B., N. Y., etc., R. R. Co.*, 32 Hun, 289; *People* v. *Brooklyn & Flatbush*, 89 N. Y. 75; *In re Grove St.*, 61 Cal. 438; *In re Newport Highway*, 48 N. H. 433; *Peck* v. *Freeholders of Essex*, 1 Zab. 656; *Mitchell* v. *Kirkland*, 7 Conn. 229; *People* v. *Landreth*, 1 Hun, 544; *Fox* v. *Hills*, 1 Conn. 294; *The Peninsular R. Co.* v. *Howard*, 20 Mich. 18; *People, ex rel. Vandeusen* v. *The First Judge of Columbia*, 2 Hill, 398; *Powers* v. *Bears*, 12 Wis. 213; *R. & S. R. R. Co.* v. *Budlong*, 6 How. Pr. 467; Cooley's Const. Lim. 563; Redfield on Railways 218, 219.) The proper time to make the objections was at the confirmation of the report. (2 Doug. [M.] 367; 1 Comp. L. 643.) There was no waiver. (16 Mich. 351; 15 Vt. 61; 2 Doug. [M.] 367; 1 B. Monroe, 213; 32 Me. 310; 47 id. 593; 6 Clarke [Ia.] 62; 1 Conn. 401.)

*Wheeler H. Peckham* for Madison avenue owners, respondents. The mayor's commission is alone authorized to impose conditions of any kind, and they must be expressed in the manner pointed out by the act. (70 N. Y. 358–359.) At the time of the passage of the act of 1884, the petitioner had not obtained the consent of the local authorities or of the property owners, and it is only *after* the routes are designated and these consents obtained, that the petitioner could become

invested with the powers conferred by section 26 of the act of 1875. (70 N. Y. 348.) The petitioner was thus proceeding to obtain these powers when the legislature repealed the provisions under which it was acting. Such repeal is effectual. (*Falconer* v. *B. & J. Co.*, 69 N. Y. 491; *People* v. *Trustees*, 70 N. Y. 28.) Section 18 of the act of 1884, applies only to street surface railroad companies organized under special charters prior to the constitutional amendments of 1870. (21 N. Y. 461; *In re El. Road*, 70 id. 348.) Repeal of statutes, jurisdictional in character are absolute and nothing thereafter done, even though already commenced, has any validity. (*Butler* v. *Palmer*, 1 Hill, 330; *Smith* v. *People*, 47 N. Y. 338.) Whatever right the petitioner has under the law is much like the right of a public officer to future fees or emoluments. It is not property — not a right recognized by or the subject of law. (*Connors* v. *Mayor. etc.*, 5 N. Y. 296.)

*Aug. S. Hutchins* and *Waldo Hutchins* for Second Avenue Railroad Company, and others, respondents. The petitioner has no standing in court, not having been duly organized as a corporation. (*Donohue* v. *O'Connor*, 45 N. Y. Sup. 301; *N. Y. Cable Railway Co.*, 40 Hun, 15; *Birdsall* v. *Clarke*, 73 N. Y. 73. *In re Emigrant Ind. Sav'gs Bk.*, 75 id. 388; *N. Y. Cable Ry.*, 36 Hun, 358.) The object of the act of 1875 was to provide for the construction of elevated and underground railways. (40 Hun, 12.)

*Grosvenor Lowry* and *Abram Wakeman* for Thirty-fourth Street Railroad Company, and others, respondents. The consents required by the statutes must first be obtained before the location by the commissioners operates in any manner to confer any rights, inchoate or other. (*Gaylor* v. *Wilder*, 10 How. [U. S.] 493; *Kerr* v. *Doherty*, 79 N. Y. 327; Austin's Juris. 886–887.)

*John M. Scribner* for certain respondents. Chapter 606, Laws of 1875, does not authorize the construction of surface

railroads, but clearly contemplates only elevated or underground railroads. (*In re N. Y. El. R. R. Co.*, 70 N. Y. 343. 346, 347, 352; *In re Gilbert El. R. R. Co.*, id. 336; *Stranahan* v. *Sea View R. R. Co.*, 84 id. 308–314.) Where a power is granted by legislative enactment, with a proviso annexed, the enactment is to be read as if no more power was ever given than is contained within the terms or bounds of the proviso. (*In re Second Ave. M. E. Church*, 66 N. Y. 395.)

*James M. Varnum*, for trustees of Gramercy Park and others, respondents. The fact that the commissioners appointed by the mayor both exceeded their powers and neglected to comply with certain mandatory provisions of the statute affected fatally all subsequent proceedings. (Laws of 1873, chap. 606, § 6; *Donohue* v. *O'Connor*, 45 N. Y. Supr. Ct. 301; *N. Y. C. R. R. Co.* v. *Forty-second St. & Man. R. R. Co.*; *In re Meth. Church*, 66 N. Y. 395; *In re Brooklyn R. R. Co.*, 72 id. 245; Rapid Transit Act, § 7; *In re N. Y. L. etc. R. R. Co.*, 35 Hun, 220; aff'd 99 N. Y. 12.). Chapter 606 of the Laws of 1875, conferred no authority upon commissioners appointed by the mayor to fix, determine or locate cable railways, or railways of any kind, upon the surface of a street, such as was done in this case. (*In re El. R. R., Co.*, 70 N. Y. 327, 373; 6 id. 366.)

RAPALLO, J. On the hearing of this motion at the General Term, the learned judges entertained different views. DANIELS, J., who delivered the principal opinion, was in favor of denying the motion on various grounds. He considered, in the first place, that the act under which the petitioner claimed to have been organized, commonly known as the Rapid Transit Act (Laws of 1875, chap, 606), did not authorize the construction of a railroad upon the surface of the land, but related only to elevated or underground railways; also that if the Rapid Transit Act ever did authorize the construction of surface roads, the General Surface Railroad Act of 1884 (Chap. 252, § 16),

prohibited the erection of surface roads under the Rapid Transit Act, and abrogated any authority which the petitioner might previously have had to construct surface roads, and further that the commissioners appointed by the mayor, as prescribed in the Rapid Transit Act, had failed to comply with some of the requirements of that act which were essential to the legal organization of the petitioner as a corporation.

Brady, J., concurred in only one of the propositions upon which Daniels, J., based his conclusion, viz.: The proposition that the sixteenth section of the General Surface Act of 1884 abrogated the authority of the petitioner to construct a surface road.

Davis, P. J., dissented from the conclusion reached by both of his associates. The only point, therefore, which was decided at the General Term was, that the provisions of the General Surface Act deprived the petitioner of all power or authority to construct a surface road.

But the other points are still in the case and are urged on this appeal with great earnestness by the counsel for the various objectors who have argued before us and those who have submitted printed briefs, and numerous objections in addition to those discussed by Daniels, J., are insisted upon.

As to a few of the routes designated by the mayor's commission, the General Term denied the motion to confirm the report of the Supreme Court commissioners, in the exercise of the discretionary power of the court in such cases, and its action with reference to those routes cannot, and is not sought to be reviewed here; but as to the residue of the routes the court has declared, in the order appealed from, that the motion was denied " solely and wholly on legal grounds and legal objections existing against the same, the petitioner being considered to have no legal right to construct or operate a railway on the streets and avenues last referred to."

This declaration in the order authorizes us to review the questions of law involved in the determination of the General Term, and seems to have been inserted with the view of inviting such an examination.

We will first consider the point on which the majority of the justices sitting at the General Term agreed, viz. : The effect of the act of 1884 (Chap. 252, § 16), as abrogating the rights of the petitioner.

The language of that section is as follows : " Section 16. No street surface railroad shall be constructed to run in whole or in part upon the surface of any street or highway, under the authority of any commission appointed under the provisions of chapter 606 of the Laws of 1875, entitled 'An act further to provide for the construction and operation of a steam railway or railways in counties of the State,' or the acts in addition thereto or amendatory thereof."

The amendments to the Constitution, adopted in November, 1874, contained a provision (art. 3., § 18) that the legislature should not pass a private or local bill granting to any corporation, association or individual, the right to lay down railroad tracks. But it was further provided that the legislature should pass general laws providing for the cases enumerated in section 18, and that no law should authorize the construction of a street railroad, except upon the consent of property owners and of the local authorities, or in case the consent of property owners could not be obtained, the determination of three commissioners appointed by the Supreme Court, which determination should be confirmed by the court.

From the time this amendment took effect, January 1, 1875, until the passage of the General Surface Railway Act of 1884, there had been no law in force under which street railways could be constructed, except the Rapid Transit Act, the General Railroad Law of 1850 being inapplicable to street railways in cities, and no other general law having been passed as required by the Constitution. The Rapid Transit Act excluded the use of animal power to draw the cars, subdivision 4 of section 26 giving authority to companies organized under that act to " convey persons or property on their railroad by the power or force of steam, or by any motor other than animal power." No horse railroad, consequently,

could be organized under that act. To provide a more complete system of street surface railways, the act of 1884 was passed. It dispensed with the machinery of a mayor's commission, and allowed companies to be formed by the voluntary association of the requisite number of persons, authorized them to select their own routes, provided the requisite number of property owners or a Supreme Court commission and the local authorities consented thereto, and did not exclude the use of either animal or steam power, but authorized the use of "animal or horse power, or any power other than *locomotive* steam power which might be consented to by the local authorities and a majority of the property owners," etc.

Having thus made provision for a system of street surface roads, more comprehensive even than could be claimed to be provided for by the Rapid Transit Act, the legislature naturally determined to make that system exclusive, and to have no more mayor's commissions for surface roads. But it was matter of public notoriety, that the commission which organized the petitioner had been at work since December, 1883. It had held numerous meetings in the city of New York, and had published notices of its proceedings from time to time as required by the act. It had determined upon the necessity of the road, had located the routes, had, after public notice, adopted plans for the construction of the roads, prepared articles of association, caused subscription books to be opened, after public notice, for subscriptions to the capital stock, and the whole of the capital stock, amounting to $2,000,000, had been subscribed, and the fixed percentage thereof paid in cash; a board of directors had been elected, and the company organized, and the certificate of organization filed. All these acts were required by the act to be done before they could become a corporation. They were completed, before the passage of the General Surface Act of May 6, 1884, viz., on the 21st of April, 1884, and the plaintiff on that day became, in so far as the plans of the commissioners provided for surface roads, an existing street surface railroad company, provided in its organization it had

conformed to the essential requirements of the Rapid Transit Act, a question which will be considered hereafter.

When the legislature passed the General Surface Railroad Act, and by section 16 made it the only law under which street surface railroads could thereafter be organized, I think that they intended to save the rights of all existing street surface railroad companies, even though they had been organized under the Rapid Transit Act; and that, with this view, section 18 of the General Surface Railway Act was inserted. That section provides that "nothing in the act shall   *   *   * interfere with or repeal or invalidate any right heretofore acquired under the laws of this State by any *horse railroad company*, or effect or repeal *any right* of *any existing street surface railroad company* to *construct*, extend, operate and maintain its road *in accordance with the terms and provisions of its charter* and the acts amendatory thereof."

It is evident from the language of this section, that it was intended to save the rights of existing street surface railroad companies other than horse railroad companies, because, after in terms providing for horse railroad companies, it adds immediately after and in the same sentence the provision for the protection of *any existing street surface railroad* company, without restricting it to horse railroad companies. As there was no law except the Rapid Transit Act authorizing the formation of street surface railroad companies to be operated by any power other than horse power, the second branch of the saving clause must have been intended to embrace existing companies organized under the Rapid Transit Act.

An examination of the proceedings of the legislature discloses that the General Suface Railway Act was proposed to the legislature by the railroad commissioners, and as originally prepared and introduced on their recommendation, it did not contain the provisions of either section 16 or section 18, but they were both inserted by way of amendment. It is not unreasonable to infer that section 18, in so far as it relates to surface roads other than horse railroads, was intended for the

express purpose of qualifying and restricting the sweeping provision of section 16.

Construed in the light of this saving clause, and in connection therewith, and bearing in mind the general principles relating to the construction of statutes as retroactive, I think the sixteenth section should be deemed to have prohibited only the construction of roads by companies thereafter organized under the Rapid Transit Act, and by authority thereafter given by commissions appointed in pursuance of that act, and was not intended to prohibit any company, theretofore organized and then existing, from exercising the corporate right and authority which it had acquired, to proceed with the construction of its road in accordance with its articles of association which had been framed by the commissioners and which constituted its charter, on complying with the conditions as to consents, imposed by the Constitution and by the Rapid Transit Act.

The saving clause which declares that section 16 shall not affect "*any right*" of any existing company to construct its road, is sought to be confined to cases where all the conditions required to be performed by the company before it can enter upon the streets and actually lay the tracks, had been performed, and it is contended that until such performance the company has *no right* to construct its road; that section 18 saves only a consummated and perfected right, which does not exist so long as any of the conditions imposed upon the exercise of the power conferred by the charter, remain unperformed.

I think this is too restricted a construction. The company, as was well known, had been for a long time engaged in having its routes determined and plans adopted by the mayor's commission and its articles of association framed. its stock subscribed and its capital in part paid in, all of which proceedings necessarily involved a large expenditure, and it had succeeded in maturing its organization and becoming an *existing company* provided its proceedings conformed to the act. If so it had acquired the corporate power and an inchoate right to construct its road, and all that remained to

be done was to acquire the perfected right to enter upon the street and lay its tracks, which was, in substance, its right of way, by obtaining the consents of the local authorities and of a majority of the property owners or in lieu thereof the approval of a Supreme Court commission.  I think the saving clause was intended to protect such right as the company had, though it was an inchoate right, and subject to the performance of further conditions.  The statute does not say the perfected right but " any right," and although it was the intention of the General Surface Act to establish a uniform system for the future organization of street surface railroads, and to prohibit the future establishment of such roads under authority of the Rapid Transit Act, yet it was not intended to arrest the operations of a company already organized under that act, or to deprive it of the corporate rights and powers which it had acquired at great expense, in reliance upon the provisions of the act.

Although the effect of section 16 on the rights of the petitioner is the only point upon which a majority of the court below, in its opinions, agreed as a ground for denying the motion, yet its order was made generally on legal grounds and legal objections, and upon the general conclusion that the company had no legal right to construct or operate a railway on the streets and avenues in question.  Any legal objection therefore, to the right of the company to construct its road is sufficient to sustain the order, and is open to the respondents on this appeal.

We must, therefore, consider the objection taken that the Rapid Transit Act did not authorize the construction of street surface railroads, but only of elevated or underground roads.

The Rapid Transit Act authorizes the commissioners appointed by the mayor, in the first place to fix and determine the route or routes, and declares that such commissioners " shall have the exclusive power to locate the route or routes of such railway or railways, *over, under, through or across* the *streets, avenues, places* or *lands* in such county, etc." This form of expression, " over, under, through or across,"

is preserved throughout the act and is often repeated, and it is claimed on the part of the appellant that the word "through" the streets refers to surface roads, and is used in contradistinction to *over* and *under*. On the other hand many provisions and requirements of the act are referred to which are applicable only to elevated or underground railways, such as those of section 5, in regard to "supports," "stations," "stairways," "elevators." Those of section 17, in regard to "depots," and those of section 26, subdivision 5, respecting "foundations," "columns," etc., and from this it is argued that only elevated or underground railways were contemplated or intended to be authorized by the act. But a similar line of argument can be used, and with equal force, in support of the contention that the act intended to provide for surface roads as well as for underground and elevated roads. Section 26, subdivision 3, authorizes the crossing of and intersection with other railroads before constructed, but subdivision 5, of the same section, contains these exceptions : "Except that nothing in this act shall authorize the construction of a *railway* crossing the track of any steam railway now in actual operation *at the grade thereof*, or the erection of piers or supports for any *elevated* railway upon a railway track now actually in use in any street or avenue." Section 29 authorizes conductors in case a passenger refuses to pay his fare, to put him out of the car at any usual stopping place or *near any dwelling-house*. Section 35 provides that where the route " shall intersect, cross or coincide with any horse railway track occupying the surface of said streets," the company may, for the purpose of constructing its work, temporarily remove the tracks of the horse railway, but "nothing contained in this act shall authorize any corporation, formed thereunder, *to use the tracks of any horse railway*." By section 4 certain streets and places are exempted from having any railroad constructed therein, and in 1881 an act was passed (Chap. 485, Laws of 1881) amending the Rapid Transit Act, providing that when any route designated by mayor's commissioners is located " over *or on* " any street

thus exempted the commissioners shall have power to substitute a location over, under, through or across any street not exempted, in the same general direction as the exempted street.

It is obvious that some of the provisions of the act are applicable exclusively to elevated or underground roads, and others exclusively to surface roads, and that such is necessarily the case where it is intended to provide for both classes of roads in a single act.

Although we may presume, from the history of the time, that the legislature had most prominently in view the securing of rapid transit by means of elevated or underground roads, yet the main object sought was rapid transit in any way it could be obtained, and in framing their act they made it sufficiently broad to include surface roads.

The act gives full power to the mayor's commissioners to decide upon the plans on which the roads shall be constructed, and contains no restriction which excludes from their adoption the plan of a surface road.

The object was to obtain some better motor than horse power, and, therefore, the act authorized steam or "any motor other than animal power. (§ 26, subd. 4.) The legislature might well trust to the local authorities, the property owners and the commissioners appointed by the mayor and those appointed by the Supreme Court, not to consent to the use of steam locomotives on the surface of the streets, and they did not in terms prohibit them, as is done in the General Surface Railway Act, which allows any power except that of a steam locomotive, including every other mode of propulsion by steam or other power, which may be consented to by the local authorities and the property owners. I think that before the passage of the General Surface Railroad Act a corporation could be legally organized under the Rapid Transit Act for the construction and operation of a street surface railway. That such was the view entertained by the legislature appears from their enacting section 16 of the General Surface Act prohibiting the future construction of surface roads under

authority of the Rapid Transit Act, except in the case of existing companies.

Section 40 is relied upon as contradictory of this interpretation. It provides that this act (the Rapid Transit Act) shall not be construed to repeal or affect the general railroad law of 1850, nor shall any of its provisions apply to any railroad company organized under any general or special law of this State for the purpose of constructing a steam railroad upon the surface of the ground, nor to the operation or management of any such railroad heretofore constructed. I do not think that this section is in any respect inconsistent with or contradictory of the argument that the Rapid Transit Act itself authorized the construction of a steam railroad on the surface. The meaning of the section, as I understand it, is that none of the provisions of the act shall apply to any surface railroad company already organized at the time of the passage of the Rapid Transit Act, under any general or special act, nor to the operation of any surface railroad constructed before the passage of the Rapid Transit Act. This concluding sentence of the section rather confirms the view that the act was understood by the legislature to apply to surface roads constructed under its provisions, by declaring in terms that none of its provisions shall apply to the operation or management of any surface road constructed before its passage.

This brings us to another class of questions which present serious difficulties. They relate to the organization of the petitioner as a corporation. Unless validly organized in pursuance of the Rapid Transit Act, it acquired no right to construct the road, and, consequently, could not demand that the Supreme Court confirm the report of its commissioners as a substitute for the consent of a majority of the property owners, and the order of confirmation would be of no avail if granted.

As no power, authority, or franchise is conferred directly by the legislature on the petitioner, but the act only prescribes the proceedings by which such rights can be acquired, a substantial compliance with the material requirements of the

act is a condition precedent, without performance of which the petitioner never became legally incorporated or acquired any rights under the act.

The general scheme of the act, omitting details, is that the public necessity for the steam railway or railways sought to be constructed in the county, shall be established by the determination of commissioners to be appointed, in cities by the mayors thereof, on the verified petition of fifty reputable householders and taxpayers of the county, and to organize as a board.

Upon the determination by such commissioners that the road is necessary, they are required to fix and determine the route or routes, and they are declared to have the exclusive power to locate the route or routes of such railway or railways, over, under, through, or across the streets, avenues, places, or lands in such county, excepting certain designated streets and avenues and also public parks and public buildings (§ 4).

The commissioners must also meet and decide upon the plan or plans for the construction of the railway or railways, with the necessary supports, turn-outs, switches, sidings, connections, landing places, stations, buildings, platforms, stairways, elevators, telegraph and signal devices, or other requisite appliances upon the route or routes and in the location determined by them (§ 5).

They must also fix and determine the time within which such railway or railways, or portions of the same, shall be constructed and ready for operation, together with the maximum rates for transportation and conveyance and the amount of capital stock, etc. (§ 6).

They must then prepare articles of association for the company to be formed. These articles must set forth and embody, as component parts thereof, the several conditions, requirements and particulars determined by the commissioners pursuant to sections 4, 5 and 6, and must further provide for the release and forfeiture to the supervisors of the county, of *all rights and franchises acquired by such corporation* in

case such railway or railways shall not be completed within the time and upon the conditions therein provided. They must also open books for subscription to the capital stock after due public notice (§ 7).

When the whole capital stock has been subscribed and the percentage prescribed by the commissioners has been paid in cash, the subscribers are to meet for organization and elect directors, and thereafter the commissioners are to deliver to the directors a certificate, in duplicate, of the organization of the company, setting forth the articles of association. Three of the directors are then to make affidavit, in duplicate, that the full amount of stock has been subscribed in good faith, and the prescribed percentage paid in cash, and that it is intended in good faith to construct, maintain and operate the railway or railways in the articles of association mentioned. The certificates and articles are to be filed in the office of the secretary of state and a duplicate in the office of the clerk of the county wherever the railway or railways shall be located, and *thereupon* the persons who shall become stockholders, shall be a corporation.

The observance of all these essential requirements is, therefore, a condition precedent to a company of this description becoming a corporation, or acquiring the right to exercise any of the powers conferred upon such corporations by the Rapid Transit Act.

The respondents claim that the petitioner has failed, in many respects, to comply with the requirements. The principal objection discussed in the opinion of Daniels, J., at General Term, is that the mayor's commission did not " fix and determine the time within which such railway or railways or portions of the same, shall be constructed and ready for operation " as required by section 6 of the act.

The commissioners disposed of the subject in the following manner: They required separately as to each of the twenty-nine different routes which they had located, that it should be constructed and ready to be operated within a specified number of months or years " from the date of the obtaining of the con-

sent of the owners of one-half in value of the property bounded on, and the consent also of the local authorities having control of, that or those portions of streets or highways upon which.it is proposed to construct and operate such railway or railways, or, in case the consent of such property owners cannot be obtained, from the date of the confirmation by the court of the determination of three commissioners appointed by the General Term of the Supreme Court in the first judicial district, that such railway or railways ought to be constructed and operated, provided that the date of such confirmation be the same or subsequent to the date of the said consent of such local authorities." After specifying in regard to the twenty-nine routes respectively, periods varying from eighteen months to five years from the date of the consents, they added the following general provisions, viz. : First. " Resolved that each of the said periods and limitations of time hereinbefore referred to, and prescribed as the time within which the several sections or portions of railway or railways shall be constructed and be ready to be operated is, however, subject to this proviso and reservation as follows : The time, if any, unavoidably consumed by the pendency of legal proceedings or by the interference of the public authorities, or by omission to open or grade, or delay in opening or grading any street or avenue or any part or parts thereof, shall not be deemed a part of any period of time within which construction and completion of the railway or railways is required to be made. But the time, if any, during which such unavoidable delay shall continue shall be added to each of the periods hereby otherwise limited for construction and completion of the railway or railways ;" and, secondly, " Resolved that it is the intent of the board of commissioners that the consents of the property owners and of the local authorities specified in section 4 of chapter 606 of the Laws of 1875, as amended by chapter 485 of the Laws of 1881, and, if necessary, the determination of commissioners to be appointed by the General Term of the Supreme Court, and the confirmation of such determination by the court, shall be obtained with all due diligence."

It is contended, with considerable force, by the respondents,

that as the time fixed by the commissioners only begins to run at the date of the obtaining of the consents, etc., and no time is limited for obtaining such consents, and the only restriction in respect to time is that due diligence shall be used for the purpose of obtaining them, there is no actual limitation of the time within which the roads are to be constructed, and the commissioners have done little more than to require that they be completed with due diligence. It is claimed that the act contemplated that a definite time should be fixed by the commissioners so that it might readily be ascertained when the rights of the petitioner terminated, and their powers and franchises might be devolved upon some other company who would supply the public necessity of rapid transit.

I have, with some hesitation, come to the conclusion that the commissioners substantially complied, in this respect, with the Rapid Transit Act. That it is reasonable to consider that the intent of the act was that companies formed under the act should be limited in respect only to time during which it was possible for them to prosecute the work, and that time when legal barriers existed to their so doing, should not be counted. The act itself provides (§ 38), that "the time, if any, unavoidably consumed by the pendency of legal proceedings, shall not be deemed a part of any period of time limited by this act," and subsequent acts recognize the principle that only *available* time should be considered. The General Surface Railway Act (Laws of 1884, chap. 252), limits the time for the commencement of the construction of the roads thereby authorized, to one year, and the time for their completion to three years after they have acquired the consent of the local authorities and that of the property owners, or the determination of the General Term. And it further authorizes the Supreme Court to extend their time during the pendency of legal proceedings.

It thus appears that the legislature, when itself undertaking to perform the duty, which by the Rapid Transit Act it had devolved upon the commissioners, of determining the time

within which street railroads should be constructed, adopted the same course as that adopted by the commissioners in this case, and it would seem to be in accordance with the spirit of the act.  If the object was to secure the speedy construction of these roads by opening the door for some other company to come in and construct the road in case the first one organized failed to do so with promptitude, that object would not be advanced by causing a forfeiture of the franchises of the company first formed, for causes which would operate on any company which might follow it.  There was ample remedy for any delay which due diligence could obviate, and which was not unavoidable.  The company would be subject to a forfeiture of its franchises for not complying with the conditions of its charter, and also to the more summary punishment of a legislative repeal of such charter.  These considerations induce me to regard the limit of time as determined by the mayor's commission, a sufficient compliance with the act.

A further objection is taken that the articles of association framed by the mayor's commission do not conform to the requirement of section 7 of the act, which is very explicit in its terms.  It requires that the articles of association shall set forth and embody the determinations of the commissioners, pursuant to sections 4, 5 and 6, and "further shall provide for the release and forfeiture to the supervisors of the county, of all rights and franchises acquired by such corporation, in case such railway or railways shall not be completed within the time and upon the conditions therein provided."  This provision is thus made an essential part of the articles of association.

The provision in respect to forfeiture, actually contained in the articles of association of the petitioner, instead of providing, as required by the act, for the release and forfeiture to the supervisors of the county of *all the rights and franchises acquired by* the corporation, in case the railway or railways shall not be completed in time, provides only (art. 10) that "in case the several portions of such railway or railways

shall not be completed, each within the time and upon the conditions hereinbefore for it provided, the rights and franchises acquired by said corporation, *for and as to any portion of such railway or railways not so completed,* shall be released and forfeited to the supervisors of the county of New York."

This is a very material departure from the requirements of the act. The mayor's commissioners had laid out twenty-nine different routes, some longitudinal, extending the whole length of the city on the easterly and westerly sides thereof, and some transverse, crossing from east to west, some long routes and some short, some elevated and some surface roads, some running through the thickly settled and some through the sparsely inhabited portions of the city, the aggregate length of the roads being upwards of seventy miles.

Whether the Rapid Transit Act contemplated that the entire rapid transit business of the city should be concentrated in the hands of a single company, I cannot undertake to say. The act was such that it was theoretically, at least, capable of giving sanction to such an organization, though the practical difficulties in the way of complying faithfully with its require-megts in devising a scheme, on such an extended scale, were very great. One thing, however, is very clear. It was not intended to sanction the organization of a company which could acquire the franchise of building all the conceivable roads now required, or which might be required for years to come, in the city of New York, and holding it for an indefinite time over that city, thus keeping off all smaller companies which might be required in particular localities, and retaining in itself the monopoly of the rapid transit business. The intention was that no franchise should be acquired to build a road, or set of roads, unless it was the actual intention of the promoters actually to build them and complete them within a limited time, and no road was to be authorized which was not intended to be thus constructed, and to secure this end the act contained stringent provisions. Before a corporation could be finally organized under the act it was required to file an affidavit of three of its directors that the full amount of stock

had been subscribed and the prescribed percentage paid in cash and that it was intended in good faith to construct, maintain and operate the railway or railways in the articles of association mentioned (§ 9). This refers to *all* the railways mentioned in the articles and not merely to a portion of them. The sixth section required the times within which the several portions of all the roads mentioned in the articles should be completed, and the seventh section for the forfeiture and release to the supervisors of *all* the rights and franchises in case the railway or *railways* (meaning all of them) shall not be completed within the appointed time.

Under the article as framed by the commissioners, the company was left at liberty to select which of the twenty-nine routes it would complete and which it would not, without any reference to the interests of the public and without the action of the company being subject to revision or control. As to many of the routes it had five years, after obtaining the necessary consents, to determine whether it would construct them, and during all this period they would hold the shadow of their exclusive franchise over the neighborhoods affected, and if they finally concluded to abandon those routes they were to suffer no penalty except to forfeit to the supervisors of the county the franchise of constructing the routes which they elected to abandon. This was not in accordance either with the letter or spirit of the act. The mayor's commissioners were sworn public officers, presumed to be disinterested, and placed in office for the purpose of protecting the public interests, and it may well be presumed that in fixing routes they would locate some which it would not be to the immediate interest of the company to construct, but for which they would be compensated by the franchise being coupled with a highly profitable route, the right to construct which would insure the construction of the others. By the device resorted to, if it were sanctioned, they would be left at liberty to determine all these matters for themselves without anything to guide them but their own interest.

In 1882 this very subject was before the legislature, and

they amended section 7 of the Rapid Transit Act by adding the following : " Provided, however, that a failure by any corporation heretofore or hereafter organized under this act, to complete its railway within the time limited in and by its articles of association, shall work a forfeiture of the franchises of such corporation, only with respect to that portion of its route which such corporation shall have failed to complete, and shall not affect the rights and franchises of such corporation to construct and operate such part of its railway which it shall have completed within the term prescribed by its articles of association, or as to which the time for completion shall not have expired, anything contained in the articles of association of such corporation to the contrary thereof in anywise notwithstanding." (Laws of 1882, chap. 393, § 2.) But by section 5 of the same act it was expressly provided that none of its provisions should apply to the counties of New York and Westchester, thus emphasizing the legislative will as declared in the original act, that in those counties a rapid transit company should be required to obligate itself to construct all the roads mentioned in its articles of association under the penalty of a transfer of all its franchises to the supervisors of the county.

The commissioners, therefore, in framing article 10 of the articles of association, attempted to override the action of the legislature in refusing to make the amendment of 1882 (Chap. 393, § 2) applicable to the city of New York, by incorporating the substance of the amendment in the articles of association of the petitioner, which they were authorized by law to prepare.

To this objection it is answered that the provision in the articles of association required by section 7 was superfluous and unnecessary, because the law would execute itself though nothing were said in the articles on the subject of forfeiture. The difficulty in the way of this answer is that there is no provision of law declaring a forfeiture to the supervisors or requiring a release to them. The only legislative enactment on that subject is the requirement of section

seven that the articles of association shall contain a stipulation or provision to that effect, and that requirement is positive and unequivocal and cannot be disregarded.

The general laws applicable to corporations would doubtless authorized the attorney-general to proceed by *quo warranto* for a forfeiture of the charter of the petitioner in case it should unreasonably delay or omit to exercise its franchises. But that would be a different kind of forfeiture from that mentioned in section 7. It would be a destruction of the franchises and not a transfer of them to the supervisors, and the act having made a specific provision on the subject, no other can be substituted.

It is further said that this requirement is not applicable to the city and county of New York because the board of supervisors of that county was abolished prior to the passage of the Rapid Transit Act, viz., in the year 1870. (Laws of 1870, chap. 190.) This, I think, is a misapprehension.

By section 11 of the act referred to, the board of supervisors, composed of supervisors theretofore elected by the people or appointed by the mayor, was declared abolished from and after the first Monday of July, 1870. But from that time all the powers and duties conferred by general or special laws upon the board of supervisors of the city or county of New York, or upon any supervisor thereof, and all the obligations of the abolished board of supervisors were declared to belong to, be devolved upon, and thereafter fully possessed, and required to be exercised, by the board of supervisors constituted by that act or by any supervisor thereof, and by section 1 of the act the mayor and the recorder of the city of New York, together with the aldermen to be elected under the act to reorganize the local government of the city of New York, (Laws of 1870, chap. 137), were declared, on and after the first Monday of July, 1870, to compose the board of supervisors of the county of New York, and each of said officers to be a supervisor of said county.

The Constitution requires (Art. 3, § 22) that there shall be in the several counties a board of supervisors to be elected in

such manner as may be prescribed by law, except in cities whose boundaries are the same as those of the county, but that in any such city the duties and powers of a board of supervisors may be devolved upon the common council or board of aldermen thereof, and certain duties are imposed upon the board of supervisors of the city and county of New York, which require that such a body be maintained in that county (Art. 3, § 3).

It cannot be claimed, therefore, that in the city and county of New York, there are no supervisors to whom the franchises of the company can be forfeited and released.

It is further contended, with much force, on the part of the respondents, that the plans for the construction of the roads are fatally defective and in many respects fall far short of a substantial compliance with the requirements of the Rapid Transit Act.

The points made on this subject in the briefs submitted by the various counsel for the respondents are so numerous that it would be impracticable, within any reasonable limits, to discuss all of them. I shall therefore select a few of those which I regard as prominent.

That it is essential to the formation of a corporation, under the Rapid Transit Act, that the commissioners appointed by the mayor should decide upon some plan for the construction of the railway or railways located by them, cannot be doubted. The distinguishing feature of the act is that the company to be organized is not left at liberty, as are railroad companies formed under the General Railroad Act, and as were those which formerly were created by special acts, to decide for themselves upon the plan of construction, but that subject was placed under the exclusive control of the commissioners, in addition to the exclusive power to locate the route or routes. The power thus vested in the commissioners to decide upon the plan of construction, was rendered necessary by the peculiar character of the roads authorized, which doubtless were principally intended to be located in populous cities, and might seriously affect valuable private rights. The extent of injury

to these private rights would necessarily depend, in a great degree, upon the manner in which the roads, and especially the elevated roads, should be constructed and operated. The necessity for increased facilities for transportation in large cities, and especially in the city of New York, was the spring which set in motion all these schemes, and when it was sought to have them forwarded by legislative sanction, the problem was to secure the greatest benefit to the public, with the least injury to private rights. It was not safe to organize private corporations with unrestricted power to construct these roads on any plan which economy and a regard solely to their own interest might suggest, and, therefore, the expedient was resorted to of the appointment by the local authorities of a board of sworn commissioners, who should give security for the faithful performance of their duties, and have power to stand between the projectors of the enterprise and the property owners and the public, and decide upon the plans which they should deem most just with reference to all these diverse interests.

This leads us to the inquiry into the extent, to which it is essential to the validity of an organization under this act, that the commissioners should exercise the power of deciding upon the plans of construction.

To begin at the foundation, I think it incontestable that they must decide whether each contemplated road shall be an underground road, an elevated road, or, if I am right in my construction of the act, a surface road. To leave either of these questions undetermined, and relegate it to the discretion of the directors of the company to be formed, would, in my judgment, be a departure from the act and a failure to comply with one of the conditions precedent to the acquisition of corporate power.

How far further it is essential, for the purpose of securing a valid organization, that the commissioners should decide upon plans of construction, it is difficult to determine. It would be very inconvenient, to say the least, to require that the details of the construction should be prescribed with the

minuteness of the usual specifications in a building contract. There undoubtedly is a line somewhere, dividing the essential from the non-essential. But we are not put to the necessity of searching for it in the present case. It is sufficient for its purposes to hold that, as far as reasonably practicable, the plans adopted by the commissioners should disclose to what extent the streets are to be encroached upon, and the property abutting thereon affected, and the means of transportation to be used, so that the local authorities and the property owners when applied to for their consents, or the commissioners appointed by the Supreme Court with authority to consent in their behalf, may have the necessary materials to form an intelligent judgment whether the scheme proposed should or should not be assented to. To this extent, at least, I think the act requires that the commissioners appointed by the mayor should decide upon the plans, and that their decision should not be made subject to any modification by the railroad company. That those who consent to the construction of the road, whether they may be the local authorities, the property owners, or the Supreme Court commissioners, may know to what kind of road they are consenting, to what degree the streets will be obstructed thereby, of what efficiency the proposed mode of construction is capable, and that their consents cannot be used for the construction of any different road.

Justice seems to require that to this extent the commands of the statute be obeyed.

The routes laid out by the commissioners have been stated. Of these several, and indeed the principal ones, are, according to the plans adopted by them, to be surface roads. But as to several of the others, and indeed a portion of those designated in the first instance as surface roads, it is, by the resolutions of the commissioners, which are embodied in the articles of association of the company, left to the subsequent election of the company whether they shall be surface or elevated roads. A more flagrant violation of the statute can scarcely be conceived.

Article 7, of the articles of association, which embody, as directed by the statute, the determinations of the mayor's commissioners, provides (subd. 1), that the railways to be constructed by the company shall be laid upon the surface of the streets or avenues, *excepting* on route No. 1, from Great Jones street to the Brooklyn bridge; No. 2, from West street to Thirty-third street and Tenth avenue, and from Second street to the northerly terminus of the route; on route No. 4, on route No. 26, and route No. 29, from Christopher street to Seventy-second street; all of which routes *may be* constructed on elevated structures. These routes comprise a very important part of the general schemes of the projected roads, and in the aggregate cover a space of upwards of seventeen miles in length, and yet the plans adopted by the commissioners do not determine whether they shall be elevated or surface roads, but leave that question to the decision of the company.

The third subdivision of article 7 provides that the elevated railways shall (with one small exception), be double track, but authority is given to add such other tracks as may from time to time be needed to accommodate increasing traffic, and to make such additions to the structures as may be needed for that purpose.

Subdivision 6 of the same article provides that the tracks of railways, when elevated, shall be carried either by longitudinal girders resting on the tops of columns or by transverse girders supported by columns, without determining which, or prescribing the height of the columns, except that the superstructure shall not be less than fourteen feet above the level of the streets (subd. 15).

Subdivision 7 declares that the plan of construction of the elevated railways having authority for more than two tracks, which is the case with all the routes except one, shall be *at the election of the company constructing the railway*, either with a row of columns on the line of each curb and a superstructure carrying one or more tracks upon transverse girders spanning the street, or with a row of columns upon the line

of each curb and a single track over each row of columns; authority being granted to add to the structure when an additional track or tracks may be needed, transverse girders between said rows of columns to support such additional track or tracks, or with a row of columns on the line of one curb and a row in the roadway of the street with authority on some streets to erect a third row in the roadway of the street for additional tracks when needed.

The power to erect stations and platforms is not restricted or defined. The company is left, by subdivision 14 of article 7, to decide where they are necessary, and to erect them over the cross streets and also to occupy so much of the sidewalks of the streets for stairways and approaches " as may be necessary," thus leaving it to the company to determine how much of the streets it will occupy, and subdivision 41 gives authority to construct " such supports, turn-outs, switches, sidings, connections, landing places, stations, buildings, platforms, stairways, elevators, telegragh, telephone and signal devices, and such other requisite appliances as shall be proper for the purpose of such railway and as shall be necessary for the convenient use of the same."

The details enumerated in this subdivision are the same which are enumerated in subdivision 5 of the act, and of which the commissioners are therein required, after giving public notice inviting the submission of plans, to decide upon the plan of construction, and yet, instead of adopting any such plan, they leave these matters to be determined by the company under a general authority to construct these appliances as may be proper and necessary for the convenient use of the railways.

Numerous other objections are made and elaborated in the points. Many criticisms are made with reference to the surface portions of the road, showing, as it is claimed, that no definite plan was adopted even for the construction of these portions of the railways, but that it was in substance left to the company to select what they should deem the most approved form. It is not necessary to go now into all these

details, as I think the particulars which have been specially referred to are sufficient to dispose of the case without passing upon the many other points made on the part of the respondents, and to show that the commissioners, instead of adopting definite plans of construction, obligatory upon the company, have left it at liberty to determine for itself many of the questions in which the local authorities and property owners are interested, and the determination of which was essential to enable them, or any commission appointed by the Supreme Court to form an intelligent judgment whether or not consent should be given to the construction of the railways, and especially they have virtually left it to the company to determine how much of the streets it will occupy, and to extend this occupation from time to time as its interests may require. In this respect it seems to me that the projectors of the road, and the commissioners, have failed to appreciate the spirit of the Rapid Transit Act, and the protection it was intended to afford to the public and the property owners. Experience has shown that an elevated road is capable of being constructed on such a plan as to interfere, to a comparatively slight extent, with the use of the streets for ordinary purposes, and with the rights of owners of property abutting thereon ; but they may also be constructed in such a manner as virtually to destroy the value of such property. The scheme of the act was to withhold from companies, formed under it, the right to determine upon these plans, and to vest that power in an impartial board of sworn commissioners, and yet, as has been shown, these commissioners have relegated to the company itself the power of deciding questions which it was their duty to determine, and even to change and enlarge their plans from time to time, as their interests may render desirable. A single observation is sufficient to illustrate this point. By the so-called plan adopted by the commissioners the company is authorized, in several instances, to elect between a surface and an elevated railway, and, where they elect the elevated, to lay tracks on columns at each curb, or at its election to lay transverse

girders from curb to curb, spanning the entire street. On these girders it purports to be empowered to lay additional tracks from time to time, without limit, as its business may require. It may, therefore, at its election, cover the entire roadway of the streets, or it may construct additional tracks on columns in the center of the roadway. It may erect stations over the sidewalks and cross streets and may occupy as much of the sidewalks as it may deem necessary for stairways, or approaches, without any restriction. The number and location of stations is not limited or defined, and all these structures over and in the roadway and on the sides may be carried to an unlimited height, so as practically to efface the buildings on the sides of the streets, the only limit being that the superstructure shall not be less than fourteen feet in height. In leaving the company at liberty to determine all these matters, and change the plans from time to time accordingly, the commissioners have uddertaken to enable it to exercise powers far more expansive and unrestricted than those which the Rapid Transit Act intended to confer.

As the views I have expressed do not in all respects meet the concurrence of all my associates, I have stated separately the conclusion which I have reached, in order that it may be ascertained what points are decided. These conclusions are:

*First.* That section 16 of the General Surface Act, construed in connection with section 18 of the same act, did not abrogate the right and power of the petitioner, if in other respects legally organized, to proceed to obtain the requisite consents, and when obtained to construct the railways in conformity to their articles of association.

*Second.* That the Rapid Transit Act did, before the passage of the General Surface Act, authorize the organization of companies to construct street railways on the surface, to be operated by any power other than animal.

*Third.* That the objection that the organization of the plaintiff is defective on the ground that the commissioners failed to fix the time for the completion of the railways, is not well taken.

*Fourth.* That the objection is well taken that the articles of association, prepared by the commissioners, fail to comply with section 7 of the Rapid Transit Act, in that they do not provide for the release and forfeiture to the supervisors of the county, of all the rights and franchises acquired by the company, in case of its failure to complete its railways within the prescribed times.

*Fifth.* That the commissioners have failed to substantially comply with the requirement of section 5 of the act, to decide upon the plan for the construction of the railways and other appliances specified in that section, and that such compliance was essential to their valid organization.

*Sixth.* That the order of the General Term should be affirmed.

RUGER, Ch. J., MILLER, DANFORTH and FINCH, JJ., concur.

ANDREWS, J., concurs on the third, fourth and fifth grounds stated in the opinion, and does not vote on the first and second grounds.

EARL, J., concurs on the third, fourth and fifth grounds stated in the opinion, and dissents from the first and second grounds.

Upon a subsequent motion for a reargument the following opinion was handed down :

RAPALLO, J.   The petitioner in this matter moves for a reargument of the appeal herein, alleging as one ground for such motion, that since the decision of this court on such appeal it has obtained from the General Term of the Supreme Court an order to show cause why the report of the commissioners appointed by it should not be remanded to them for further hearing, which order to show cause is now pending, and that in order to comply with the opinion of this court, the petitioner has taken proceedings for the amendment of its articles of association by inserting therein an amended article 10, in relation to the forfeiture of its rights and fran-

chises to the supervisors of the county, and that to further comply with such opinion the petitioner has by resolution of its board of directors requested the president of the board of commissioners, appointed by the mayor, who framed the said articles of association, to call a meeting of the said commissioners for the purpose of correcting the defects and supplying the omissions pointed out in said opinion. That the president of said board of commissioners had reconvened them, and they have further determined as to the plans for the construction of the petitioner's railway, and have amended them in the particulars mentioned in the opinion, and the petitioner is willing to do such other things as may conform to the judgment of this court.

The petitioner claims that the functions of the mayor's commission have not expired, but were continued and were still existing at the time of this amendment, said commission having at its meeting in June, 1884, reserved the right to reconvene at the call of its president; that the times fixed by the Rapid Transit Act for the performance of the several acts to be performed by the mayor's commission were not mandatory but merely directory; that under the circumstances of this case they could be performed at the time of the amendment, and that the amendment of the articles of association was authorized by chapter 135 of the Laws of 1870, which empowered corporations formed under general laws to amend their certificates of incorporation in case of any informality therein.

Many grave objections are suggested to the validity of these proceedings to amend; but they cannot be considered on this motion. Even if the proceedings to amend were effectual, they would not afford ground for a reargument of the appeal. The jurisdiction of this court is confined to a review of determinations actually made by the Supreme Court, and this review must be had upon the same papers which were before the General Term. We cannot rehear the matter upon a different state of facts from those upon which the General Term acted, for that would be an exercise

of original jurisdiction on the new state of facts presented, and not a review of the actual determination of the court below.

If a new state of facts, giving rise to new questions, and obviating the legal objections which existed to the application originally made by the petitioner, is now presented (a question which is not now properly before us, and upon which, therefore, we do not express any opinion) the order made by this court affirming the order of the General Term denying the application of the petitioner, will be no obstacle to a rehearing of the matter at the General Term on the alleged new state of facts, should that tribunal see fit to grant such a rehearing, or to a new application based upon new facts. (*Riggs* v. *Pursell*, 74 N. Y. 370.) And on such hearing, or new application, if the legislation of 1884 has not precluded the petitioner from proceeding under the Rapid Transit Act to obtain authority through the action of a mayor's commission since 1884, to construct a surface road, it will be open to the Supreme Court to exercise its discretionary power over the whole matter or to pass, as it did in the first instance, only on questions of law. We, however, cannot make any modification of our decision, or any order in the matter, based upon the alleged change of facts, or alleged amendment of the proceedings of the mayor's commission and of the articles of association.

Some other grounds, however, are urged in support of this application for a reargument, which will be briefly noticed :

*First.* It is alleged that the articles of association of the petitioner were prepared upon the model of the articles of association of the Manhattan Elevated Railway Company, which company is said to have been organized under the Rapid Transit Act. On this point it is sufficient to say that the articles of association of the Manhattan Elevated Railway Company have never been before this court, nor have we any judicial knowledge of their provisions, or their existence, unless they came incidentally in question in the *Matter of the Gilbert Elevated Railroad Company* (70 N. Y. 361). They are not even mentioned, either in the arguments of counsel or

in the opinion of the court in that case.   None of the questions involved in the decision of this case were discussed in that case, nor was the attention of the court called to any of them if they existed.   The sufficiency of those articles has not been litigated or considered in any case which has been before this court.

*Second.* It is claimed that from the opinion in this case, the court appears to have overlooked its decision in the *Matter of the New York Elevated Railroad Company* (70 N. Y. 327). That case was fresh in the memory of the court.   Several of the judges who participated in its decision, including the judge who delivered the opinion, having concurred in the decision of the present case, and we are unable to find that any point decided or discussed in that case, conflicts with the decision in the present one in any particular.   In so far as the validity of the organization of the present petitioner is concerned, it is impossible that there should be any such conflict, because the New York Elevated Railway Company was not organized under the Rapid Transit Act.   (Chap. 606 of the Laws of 1875.)

The New York Elevated Railway Company was originally incorporated under the General Railroad Law of 1850, and the Supplementary Act of 1866.   It was recognized as an existing corporation, by chapter 595 of the Laws of 1875, entitled " An act to authorize and require the New York Elevated Railroad Company to continue and complete its railroad in the city of New York and to regulate the construction, operation and management thereof."   That act recited the incorporation of the Elevated Railway Company under the General Law of 1850; that it had acquired by purchase, under foreclosure of a mortgage, the powers and franchises of the West Side and Yonkers Patent Railway Company, and was, by the act last referred to, confirmed in the possession and enjoyment of said rights and franchises; and the powers of certain commissioners previously appointed were extended to it; and prior to the passage of the Rapid Transit Act it had constructed and was actually operating an elevated steam railway on a portion of its route.   After the passage of the Rapid

Transit Act it proceeded under section 36 of that act to make certain connections and additions to its route, and no question could arise in the case except with respect to those connections. But even as to those, nothing was discussed in the opinion, or decided, which touches the present case. The only point claimed in the papers on the present motion to have had that effect, is that while the mayor's commissioners had given to the elevated railway company authority to elect between several specified plans for the construction of a certain portion of the connections, the Supreme Court commission had imposed as a condition that the company be confined to one of the specified plans, unless the property owners should consent, and the point made was, not as to the action of the mayor's commissioners in giving the right of election, but as to that of the Supreme Court commission, which it was said exceeded its powers in imposing the condition which restricted the company to one only of the plans, and all that this court said upon the subject was that that complaint would come more properly from the railway company than from the property owners. No question as to the incorporation of the Elevated Railway Company was before the court, it being fully recognized as an existing corporation The same remarks apply to the case of the *Gilbert Elevated Railway Company* (70 N. Y. 361). That company was organized as an elevated road before the Rapid Transit Act of 1875, under acts passed in 1872, 1873 and 1874, and was an existing corporation at the time of the passage of the Rapid Transit Act. The proceeding which came before this court was had under section 36 of the Rapid Transit Act, which authorized any existing corporation which had not forfeited its charter, or failed to comply with its provisions, whose route or routes coincided with those determined upon by commissioners appointed under the Rapid Transit Act, to construct and operate its railway thereon upon fulfillment of the requirements of the Rapid Transit Act. The question mainly considered was the constitutionality of section 36, which was contested as violative of section 18 of article 3 of the Constitution.

These cases were not overlooked, but we found nothing in them in conflict with the conclusions at which we were constrained to arrive in the present case.

*Third.* It is claimed that this court overlooked the authorities cited on the appellants' points, to the effect that a defect in articles of association or in the affidavits annexed thereto, is not fatal to the existence of a corporation or its faculty to acquire franchises, but that the State alone can interpose and take advantage of such defects.

This court did. not deem it necessary to comment in its opinion upon those authorities for the simple reason that we did not deem them applicable to the case at bar.  In order to sustain proceedings by which a body claims to be a corporation, and as such empowered to exercise the right of eminent domain, and under that right to take the property of a citizen, it is not sufficient that it be a corporation *de facto.*  It must be a corporation *de jure.*  Where it is sought to take the property of an individual under powers granted by an act of the legislature to a corporation to be formed in a particular manner therein directed, the constitutional protection of the rights of private property requires that the powers granted by the legislature be strictly pursued, and all the prescribed conditions be performed.  Where the power is conferred upon a corporation, duly formed, it will not be defeated simply because the corporation has done or omitted some act which may be a *cause* of forfeiture of its rights and franchises, for it rests with the State to determine whether such forfeiture will be enforced.  Judicial proceedings are necessary to enforce such a forfeiture and it may be waived.  That was the point to which the opinion in the matter of the *Brooklyn, etc., Railroad Company* (72 N. Y. 245), cited by the appellant was directed.  It was assumed that this distinction was well understood, and a considerable portion of the opinion of this court in the present case was devoted to showing that the omissions and defects in the organization of the company were failures to comply with the conditions precedent to the existence of the petitioner as a corporation,

and the exercise by it of the right of eminent domain, instead of being mere causes of forfeiture of rights acquired.

The petitioner further contends on this motion, that this court has not pointed out any objection to the plans of so much of the petititioners railways as are surface roads, and therefore claims that the surface railways should be allowed, even if the others were disallowed.

But the learned counsel overlooks the fact that even if the plans of the surface roads were in compliance with the act, that would not authorize a reversal of the General Term decision, or authorize a confirmation of the report of the Supreme Court commissioners. Even assuming that the report of those commissioners was not an entirety, and that it should be held equivalent to a consent of property owners as to a part of the routes, and ineffectual as to the others, the objection of the want of the prescribed forfeiture clause, applies to all the routes, and precludes even a partial confirmation.

Our decision was reached after careful examination and deliberation, in view of the large interests involved. But, notwithstanding our strong inclination to sustain the rights claimed to have been acquired by the petitioner, if it could reasonably be done without disregarding the protection which the law had thrown around the public and private rights affected, we found some of the objections presented and insisted upon by the respondents insurmountable.

Our attention has not been called, on this motion, to any subject which we had overlooked nor to any consideration which should induce us to change our conclusions.

The motion for a reargument, or to amend the remittitur, should therefore be denied.

All concur.

Motion denied.