In the Matter of the Petition of the KINGS COUNTY ELEVATED RAILWAY COMPANY to Acquire Lands.

The plan for an elevated railway in the city of B., adopted by the commissioners appointed by the mayor, under the provision of the "Rapid Transit Act" (§ 5, chap. 606, Laws of 1875), provided that there should not be more than two rows of columns or more than two tracks in any one street, avenue or public place; it did not expressly direct the construction of two tracks. The wording, however, of other portions of the plan indicated that two tracks were contemplated. *Held*, that this was substantially a requirement to construct two tracks; but if not, the omission did not constitute a defect.

The plan required that in streets less than forty-five feet wide there should be a row of columns on each curb, with transverse girders spanning the street. In wider streets the company was permitted to build upon the same plan, or with two rows of columns, not on the line of the curb but in the roadway, carrying the tracks upon transverse girders, or each row carrying its own track separately. Where columns were put in the roadway on each side of a surface railway track, the minimum distance between the columns, was prescribed; columns were forbidden between surface railway tracks where they are less than five feet apart. *Held*, the fact that the plan did not locate the columns in the roadway or prescribe the distance from the curb was not a defect, that the location was given with sufficient accuracy; and that there was a substantial compliance with the law.

The plan provided that no part of the superstructure should be less than fourteen feet above the level of the street. *Held*, that the failure to fix definitely the height of the structure, if a defect, was one of so slight and unimportant a character as not to justify a condemnation of the whole plan, with the consequences of destroying the corporate life founded upon it.

*It seems*, however, the omission was not a defect, as the proper height for the superstructure would depend upon the grades, and so, of necessity, would be variable, and could not be fixed save as the result of an accurate survey and profile, and such a degree of accuracy was not within the duty of the commissioners.

The plan did not fix the number or the specific location of the stations

and stairways. *Held*, that while the omission was a defect, it was not by itself and standing alone one of sufficient importance to require a denial of the corporate existence of the company; and that, notwithstanding the omission, there was a substantial compliance with the statute.

*In re N. Y. Cable Co.* v. *Mayor, etc.*, (104 N. Y. 1), and *In re K. C. E. R. R. Co.* (105 id. 97) distinguished.

(Argued December 7, 1888; decided January 15, 1889.)

APPEAL by property owners from order of the General Term of the Supreme Court in the second judicial depart- ·ment, made May 14, 1888, which affirmed an order of Special Term appointing commissioners to ascertain and appraise the compensation to be made to said landowners for lands sought to be taken by the petitioner.

The petitioner was organized and these proceedings were instituted under the Rapid Transit Act (Chap. 606, Laws of 1875). Its charter and articles of association were filed in January, 1879. The property-owners objected to the appoint- ·ment of commissioners on the ground that "the plans and specifications adopted by the rapid transit commissioners," and contained in the articles of association, were insufficient in law to give the petitioner a corporate existence.

The provisions of the articles, so far as the same were brought in question, are as follows :

" 1. The general plan or plans of the structure shall be of an elevated railway, supported upon a row or rows of columns ; the track or tracks shall be carried by longitudinal girders, resting either upon the tops of the columns or upon transverse girders supported by the columns ; combined steel and stone ·columns of the American Pier and Column Company may be used where space permits or other reasons render desirable.

" 2. Where the width of the street between the curbstones does not exceed forty-two feet the plan of construction shall be as follows, to wit., with a row of columns on the line of each curb and a superstructure carrying the tracks upon transverse girders spanning the street.

" 3. Where the width of the street or avenue between· the ·curbstones is more than forty-two feet the plan of construc-

tion shall be as follows, as the company constructing the railway shall elect, *i. e.*, either, *first*, with a row of columns upon the line of each curb and a superstructure carrying the tracks upon traverse girders spanning the street; or, *second*, with two rows of columns in the roadway of the street and a superstructure carrying the tracks either upon transverse girders or over each row of columns; but no columns authorized in this plan of construction shall be erected between any two tracks of a street railroad or railroads are less than five feet apart. On the portion of Fulton street, below Sands street, and Broadway, below Second street, rows of columns may be set on each curb line and a superstructure erected carrying the tracks over each row of columns.

"4. On Fulton street, Washington street, Myrtle avenue, Lexington avenue and Nostrand avenue, except as otherwise provided, and except on switches and curves, the distance between the center line of the two tracks shall not exceed eighteen feet, and each track shall not exceed eighteen feet and each track shall be equi-distant from the center line of the street.

"5. Whenever a column or row of columns is above authorized to be upon a line of curb, such column or row of columns shall be erected only within the line of curbstones, and shall be there so situated and placed as not to obstruct vehicles or the ordinary traffic or travel of the roadway or street.

"6. There shall not be more than two rows of columns or more than two tracks in any one street or avenue or public place, except as hereinafter authorized.

"7. No columns shall be erected between any two tracks of street railroad, now upon the surface of the roadway of the street, except as herein otherwise authorized.

"8. Except where the width of a cross street, between the curbs thereof, is forty-two feet or more, every cross street shall be spanned by a single span, when and where the plan of construction used is one having a row of columns upon a curb line.

" 8*a*. When and where the plan of construction used is one having two rows of columns in the roadway of the street, no column shall be erected within the curb line of a cross street elsewhere but upon the center line of such cross street, but may be there erected.

" 8*b*. A single or double-track may be placed between longitudinal girders and carried by iron floor beams, the latter supported by the longitudinal girders.

" 8*c*. Where columns are authorized to be in the roadway on each side of a street railroad track upon the surface of the roadway, the tranverse distance between the columns shall be at least twenty-one feet in the clear.·

\*          \*          \*          \*          \*          \*          \*

" 11. The longitudinal distance between columns on the curb shall be at least twenty feet.

" 12. On curves of three hundred feet radius or less, the longitudinal distance between the columns in the roadway may be reduced to not less than twenty-five feet.

" 13. No part of the girder or superstructure shall be less than fourteen feet above the level of the street.

\*          \*          \*          \*          \*          \*          \*

" 38. Stations shall be so arranged as to be convenient of access from the street.

" 39. There shall be no steps (other than those leading from the street), sills or any other projections about stations, over which persons can trip or stumble.

" 40. The platforms of stations shall be on a level with the platform of the cars; and nothing shall intervene between a platform and the cars that must be stepped over to enter a car.

" 41. Each station shall have ample space under cover to accommodate the passengers.

" 42. Where two rows of columns are authorized, and either row is placed in the roadway of the street, the columns should be erected in pairs, and both columns of each pair shall stand in line upon a line at right angles to the direction of the length of the street, except on curves and switches.

"43. The stairs and all parts of the stations, except the platform, doors, windows and inside sheathing and except the tread of the stairs, shall be of iron.

"44. All station platforms and stairs shall be protected by a substantial iron railing.

\*        \*        \*        \*        \*        \*        \*

"48. Authority is given for construction of such supports, turn-outs, switches, sidings, connections, landing-places, stations, buildings, platforms, stairways, elevators, telegraph and signal devices, and such other requisite appliances upon the route or routes, and in the locations determined by the commissioners, as shall be proper for the purpose of rapid transit railways, and as shall be necessary to meet the requirements of the traveling public."

*Wm. J. Gaynor* for appellant. In order to maintain statutory proceedings to acquire property of the individual in the exercise of the power of eminent domain, "it is not sufficient" that the petitioning body "be a corporation *de facto*. It must be a corporation *de jure*." (*N. Y. Cable Co.* v. *Mayor, etc.,* 104 N. Y. 43.) No corporate existence can be acquired under the rapid transit act, except on compliance with its essential requirements. (*N. Y. Cable Co.* v. *Mayor, etc.,* 104 N. Y. 21, 22, 31, 32, 43.) The commissioners appointed under it become public agents, with limited and defined powers, the act itself being their letters of authority, and those who deal with them do so charged with notice that they can derive no franchise or right from the public through them, except in the manner and within the limits, restrictions and safeguards prescribed by the public in the act itself. (*Smith* v. *Newburgh,* 77 N. Y. 130; *Parsel* v. *Barnes,* 25 Ark. 261; 109 N. Y. 32.) The "plan," as shown in the articles, must be such that the commissioners appointed to appraise the compensation to be paid for the taking of property can know what is to be taken, what loss of light, air and space for access is to be suffered, what damage is to be done. (*Lahr* v. *Met. El. R. R. Co.,* 104 N. Y. 269.) Only by a statement of the facts, of the omissions and defects

claimed to exist, could the issues be raised. The mere state-
ment of a conclusion of law in a pleading cannot raise an issue.
(*Sheridan* v. *Jackson*, 72 N. Y. 170.)

*Leslie W. Russell* for respondent. After filing the articles
in proper form, the corporation came into being by force of
the statute, and the defect, if any, became a mere cause of
forfeiture at the suit of the state. In such case it cannot be
asserted collaterally. (*Walsh* v. *Silliman*, 2 Hill, 491; *Fonda*
v. *Sage*, 46 Barb. 110; *Thompson* v. *Harlem*, 3 Sandf. Ch.
625; *Nicoll* v. *N. Y. & E. R. R. Co.*, 12 N. Y. 121; *Towle*
v. *Remsen*, 70 id. 303; *Sewall Falls Co.* v. *Fiske*, 23
N. H. 171; *Schulenburg* v. *Harriman*, 21 Wall. 45;
4 Gill. & J. [Md.] 127; *Denike* v. *Cement Co.*, 80 N. Y.
599.) Where, as in this case, power of judgment is given to
a board, and especially where it is required to " decide "
or " determine," it is invested with such a judicial dis-
cretion that its acts cannot be collaterally attacked, and, if
there be no remedy by way of *certiorari* or writ of prohibi-
tion, then its decision is final. (*Urquhart* v. *City of Ogdens-
burg*, 91 N. Y. 67; Broom's Legal Maxims, 89; *Lansing* v.
*Toolan*, 37 Mich. 152; *Marquette* v. *Ogdensburg*, 91 N. Y.
71; *Marrifield* v. *Worcester*, 110 Mass. 216; *Darling* v.
*Bangor*, 68 Me. 112.) The commissioners do not lose all
jurisdiction if they even err somewhat in judgment in not
being quite as specific as after events show they might have
been with safety; that is simply an error of judgment, pro-
vided it be a subject upon which they can exercise judgment.
(*In re K. C. El. R. R. Co.*, 105 N. Y. 97.) The decision in
the case of *The People of the State of New York* v. *The
Kings County Company* is conclusive here. (*Duchess of King-
ston Case*, 2 Smith's Lead. Cas. 662; Taylor's Evidence [8th
Eng. ed.] § 1674; *Perry* v. *Meddowcraft*, 10 Beav. 122;
*Thompson* v. *N. Y. & H. R. R. Co.*, 3 Sandf. Ch. 679, 707;
*Hoyt* v. *Gelston*, 13 Johns. 141, 153, 154; Id. 561–578;
*Carnarvon* v. *Villebois*, 13 M. & W. 313; 14 L. J. Exch. 233.)

FINCH, J. At the threshold of this case stands a question which is alleged to supply a perfect barrier to the attack made upon the corporate life of the company which, in this proceeding, seeks to condemn property for the public use. That question concerns the force and effect of a judgment rendered in an action brought in the name of the People, by their attorney-general, against the corporation, and which adjudged the lawful organization of the Kings County Elevated Railroad Company, and its right to continue to exist. We pass by that question without discussing or determining it, although fully appreciating its importance and interest, because we have reached a conclusion upon the merits of the controversy which makes the possible protection of that judgment unessential, and desire to free our previous adjudications from inferences stretching seriously beyond what was intended at the time, and what is warranted by the decision actually made.

Four separate and distinct grounds are asserted by the landowners defending this proceeding upon which it is claimed we should decide that the moving corporation never became such in fact; and all of these respect the manner in which the commissioners under the rapid transit act performed their duties, and the sufficiency of the plan which they formulated for the construction of the road.

One of these grounds relates to the provision limiting the number of tracks permitted to be laid. The sixth subdivision of the general plan adopted by the commissioners reads thus : " There shall not be more than two rows of columns, or more than two tracks in any one street or avenue or public place, except as hereinafter authorized." No wider or different authority was afterwards given, and the provision limits the company to two tracks, but does not in express terms direct the construction of two ; and that is the criticism now made upon the sufficiency of the plan as it respects the tracks.

It is first to be observed that no such question was raised in or decided by the *Cable Case* (104 N. Y. 1), upon which these appellants principally rely. The defect there was that no limitation was put upon the number of tracks which the

company might build, and it was left in possession of the power to occupy the whole width of the roadway with its rails and trains, and no property-owner could know in advance how grave or slight would be the resultant interference with the street. That difficulty does not here exist. The number of tracks is limited to two, and occupation of the street beyond that is restrained. But it is a new defect which is suggested, and consists of an omission to command the construction of two tracks, and leaving the company at liberty to lay but one. Some things, however, the commissioners could safely assume. They were placed in position to guard the public against injuries or encroachments which the interest of the company might lead its managers to attempt, and were bound to protect the right of the People at every such point. Consistently with that duty they could safely and prudently omit details which the interests of the company would be certain to supply. I do not think that any one would have imagined, at the date in question, that a corporation would seek to run a rapid transit elevated road through a large city upon a single track, or that there was danger of such a mistake against which precaution was needed. The numerous stations comparatively near together would require side-tracks for the frequent trains to pass, with an expensive accumulation of switches and of men to operate and guard them, and, when completed, little more of rails would be needed to make the track double, with a vast increase to the company of its capacity to run frequent trains, and of safety to its own equipment. The danger was not at all that the company would not build two tracks; its own obvious necessities would provide for that; but the temptation might come with increase of population and growth of business to add more, and so affect injuriously the public right. Against that peril the commissioners guarded, and assumed, as they very well might, that there could be no possible temptation on the part of the company to run their road with a single track. Indeed, that assumption rises almost, if not quite, to the level of a command, for the commissioners repeatedly speak of trans-

verse girders carrying the tracks, and never describe a single track except in connection with two rows of columns, each row carrying its own. And more specifically, when providing an alternate plan for wide streets they prescribe the distance between the center lines of " the two tracks," plainly contemplating them as involved in the plan of construction. And so we are quite certain that the omission pointed out does not, in fact, exist, or if it does, constitutes no defect in the commissioners' plan.

Another alleged fault respects the alternative plans provided for streets exceeding forty-two feet in width. It was first required that in the streets of that width or less there should be a row of columns on each curb, and a superstructure carrying the tracks upon transverse girders spanning the street. With that requirement no fault is found. But in streets more than forty-two feet wide the company were given an alternative. They were permitted to build upon the plan devised for the narrower streets, but, as it was obvious that a roadway might be so broad as to make the transverse girders, stretching from curb to curb without intermediate support, dangerous and unfit, an alternative plan was provided to avoid the difficulty. That was two rows of columns, not on the line of the curb, but in the roadway, carrying the tracks upon transverse girders, or each row carrying its own track separately. The point of the criticism upon this alternative is that it does not locate the columns in the roadway or their distance from the curb. But that distance would vary with the varying widths of the streets, and directions are given as nearly as possible outside of the details of an engineer's specifications. The articles forbid columns between the tracks of surface railways where they are less than five feet apart. On Fulton and Washington streets, Myrtle, Lexington and Nostrand avenues the distance between the two tracks, measuring from the center line of each, is not to exceed eighteen feet, and each track is to be equidistant from the center line of the street. Where columns are to be put in the roadway on each side of a surface railroad track, the transverse distance between the columns is

to be at least twenty-one feet in the clear.   It is thus apparent that in wide streets where the columns were to stand in the roadway their location was dictated so far·as was deemed necessary.   Greater precision would have been needless, and as likely to result in injury as benefit.   We said in the *Cable Case* that the accuracy and detail of building specifications was not requisite to the validity of the commissioners' plan, and that the line between essentials and non-essentials was not easy to draw.   In the present instance we think the further details insisted on involve a degree of minuteness and precision not requisite to the end in view, and that the alternative plan for wide streets was sufficient, and a substantial compliance with the law.

We have now reached the two remaining objections which *were* the subject of comment in the *Cable Case*, and for that reason are now said to be conclusive upon us.   It seems to me very plain that such an inference from the doctrine of that case is entirely unwarranted by the terms of the decision.   It was stated in the opinion that there was some degree of disagreement among us, and not a concurrence in all respects ; and so, five propositions were formulated as the result of the opinion and upon which the court acted, and concurrence in the propositions did not involve a necessary indorsement of all the reasons urged in their support.   In the fifth proposition the whole court concurred, and do still concur.   That was, as stated in the opinion, that the action of the commissioners was not "a substantial compliance" with the requirements of section 5 of the Rapid Transit Act.   We have not the least disposition to recede from or question or modify that proposition.   It rested upon at least two omissions of the most important and vital character, one, that it was left undetermined, for seventeen miles of the routes authorized, whether the construction should be a surface or an elevated road ; an omission properly characterized in the opinion as a flagrant violation of the statute ; and the other that the number of tracks was left unlimited, so that the whole width of the roadway might be occupied by them, and in some streets

even a third row of columns might be erected. These facts alone established that no definite plan was dictated by the commissioners, but the choice of a plan was substantially left to the corporators. To these essential and palpable defects were added two others — not as in and of themselves so vital and important as alone sufficient to invalidate the action of the commissioners, for no such doctrine is asserted — but as further and added illustrations of the defectiveness of the proposed plan considered in its entirety as such. These were a failure to fix definitely the height of the structure, except that it should not be less than fourteen feet; and an omission to locate the stations and the stairways leading to them. The opinion treated these omissions as defects; the decision did not necessarily involve that concession, or hamper the freedom of the court. But if it did the question would still remain whether the two omissions are of such importance and so vital that a plan complete and perfect in all other respects must be deemed for those defects alone a failure to substantially comply with the Rapid Transit Act. To that question, which is the one here presented, and which the *Cable Case* did not assume to decide, we must now direct our attention.

I do not regard the omission to prescribe the fixed height of the structure as a defect at all, but, if it be one, it is certainly of so slight and unimportant a character as not to justify a condemnation of the plan adopted with the consequence of destroying the corporate life founded upon it. In settling the details of that plan it must have been obvious to the commissioners that the danger to the public welfare and convenience was not that the structure would be too high, but too low. Every foot of increased height would involve so much of additional expense in both material and labor, and in the inevitable necessity of heavier columns and girders and further means of securing stability and safety. In addition to that, the height of the structure above the surface necessitating stairways up which the passenger must ascend is, in itself, a disagreeable consequence of the system, which no company

would be likely to make worse at a needless increase of cost. On the contrary, the temptation would be to build as little above the surface as would at all answer, and the danger to be apprehended was not one requiring restraint in an upward direction. Such restraint might reasonably be deemed unnecessary as a prudent element of the plan devised; and, indeed, might produce serious evil, and hamper and mutilate the general design rather than improve it. Of course the builders of the track would aim to make it level or depart from that effort only by moderate grades, and any plan made in advance would show varying heights above the surface dependent upon the conformation of that surface and the consequent grades. The prudent and proper height would, therefore, largely depend upon these grades, and, of necessity, be variable and irregular. It could not be fixed except as the result of an accurate survey and profile, and by the precise figures of an engineer dictating the details of construction. It was not within the duty of the commissioners thus to establish permanently the grades of the road. So much minuteness and accuracy was not intended to be imposed, and the only danger to be apprehended was provided for in the provision which fixed the minimum of height. The omission to go further cannot justly be deemed a material defect in the plans, and that, quite certainly, would have been our conclusion in the *Cable Case* had its fate hung upon that one omission, or its solitary existence challenged a specific consideration.

There remains, therefore, but a single defect in the plan formulated by the rapid transit commissioners upon which the appellants have relied. That is the omission to fix the specific locations of the stations and stairways. Of this omission the opinion in the *Cable Case* declared that it gave the company power to erect stations over the sidewalks and cross streets, and to occupy as much of the sidewalks as it might deem necessary for stairways or approaches without any restrictions. The opinion also seems to assume that section 5 of the Rapid Transit Act required a location of such stations and stairways. I think that assumption was an error which

would not have been made had specific attention been drawn
to the language of the statute. If that section compels the·
location of stations and stairways, it equally compels that
of every column or "necessary support," of every turn-out·
or siding, of every connection, of every landing place and
platform, and of every telegraph and signal device. Cer-
tainly that was not the. meaning or purport of the section.
These details were mentioned as incidents of the railroad, and
as included and .embraced within it as such, and the meaning
of the section is that the commissioners must decide upon the
plan or plans of the railroad with its specified incidents upon
the routes and in the locations determined by them. It does
not follow, however, that the opinion in the *Cable Case* was·
erroneous in holding that some general location of the stations
was within the duty of the commissioners. Such action as
an element and detail of the plan might very properly, in the
interest of the public, have been made and included in the
conditions imposed. The interest of the company might·
not in all respects coincide with that of the People, and it·
might build fewer stations and further apart, or in more
unfitting localities than the public convenience required. We
cannot, therefore, say that the omission was not a defect, and
we are thus compelled to take the measure of its importance
and determine whether by itself and standing alone it should
prevent a judgment of substantial compliance.

Of course it was not necessary to direct that stations should
be built, for without them no capital would construct the road,
nor to say that, in the main and as a general, rule they should
be built at the cross streets, for the interest of the company,
and of the public would concur in that. Wherever built they
would occupy space in the air above the streets and their stair-
ways spring from the sidewalk. Such consequent occupation
of street and sidewalk was contemplated by the act and insep--
arable from that element of the plan which dictated an elevated
instead of a surface road. The defect, therefore, accurately
measured, respects simply the number and localities of the
stations. I do not think it was requisite to fix the precise·

number of all and exact locality of each, but if the articles had prescribed that the stations should be not more than a certain number of blocks apart, and not less than a certain other number of blocks apart, so as to prevent either too many stations on the one hand or too few on the other that would have been a sufficient location. We see, therefore, the true character and measure of the omission. It is not at all vital, or even serious ; for the company could not operate its road without stations at which to receive and discharge passengers ; the sharp rivalry of the surface roads would tend to make them sufficiently frequent and convenient ; and no very serious or appreciable injury could reasonably be apprehended from an omission to dictate locations in some general way. The property owners, called upon for their consent, would understand that stations were requisite, and each would know that one might come in his own locality. He could refuse for that reason, although experience has taught the lesson that such stations are often a benefit rather than an injury to the business property in their immediate vicinity.

If in the *Cable Case*, the omission as to stations had been the sole and only defect in the commissioners' action, I am confident that the learned and lamented judge who wrote the opinion, and the court which concurred with him, would not have denied the corporate existence. Such a result standing upon a single ground so narrow and relatively unimportant would not have been justified, and is not within the scope and spirit of the decision. That question, not then presented, is before us now, and I do not hesitate to conclude that in the case at bar the action of the commissioners was a substantial compliance with the law notwithstanding the omission under consideration. All through the opinion in the *Cable Case* runs the concession that not a detailed and precise and rigid compliance is to be exacted, but one which, looking over the whole action taken, is substantial and does fair justice to the purpose and aim of the law. Substantial compliance involves the admission that there has not been exact and perfect compliance and that there are minor defects and omissions. The

single one here existing seems to us of that character, and not sufficient standing alone to require us to deny the corporate existence.

The questions thus discussed were not presented in *Matter of Kings Co. Elevated Railroad Co.* (105 N. Y. 97), but those there considered, with a single exception, related to an alleged forfeiture of the rights acquired and a failure to secure the necessary consent. The corporate existence of the company was there asserted and maintained against the objections then presented.

The order should be affirmed, with costs.

All concur, EARL and GRAY, JJ., on the ground that the case of the *People* v. *Kings County Railroad Company* is conclusive here; it was a proceeding *in rem*, instituted by the state, and its determination established the legality of the corporate existence of the company, and it could not be disputed collaterally thereafter.

Order affirmed.